David Greene (CA State Bar No. 160107)
Roger Myers (CA State Bar No. 146164)
BRYAN CAVE LLP
560 Mission Street, 25th Floor
San Francisco, CA 94105-2994
Telephone:   (415) 268-2000
Facsimile:    (415) 268-1999
roger.myers@bryancave.com
david.greene@bryancave.com

James R. Wheaton, (CA State Bar No. 115230)
Lowell Chow, (CA State Bar No. 273856)
FIRST AMENDMENT PROJECT
California Building
1736 Franklin Street, Ninth Floor
Oakland, CA 94612
Phone: (510) 208-7744
Facsimile: (510) 208-4562
wheaton@thefirstamendment.org
lchow@thefirstamendment.org

Attorneys for Plaintiff
SETH ROSENFELD

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SETH ROSENFELD,<br><br>              Plaintiff,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, and UNITED STATES FEDERAL BUREAU OF INVESTIGATION,<br><br>              Defendants. | CASE NO. 90-3576 EMC<br>and<br>CASE NO. 85-1709 EMC<br>CASE NO. 85-2247 EMC<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br>[5 U.S.C. §552(a)(4)(E)(i)]<br><br>Date:   July 13, 2012<br>Time:  1:30 PM<br>Judge:  The Hon. Edward M. Chen<br>Courtroom 5, 17th Floor |

# TABLE OF CONTENTS

NOTICE OF MOTION

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................1

III.    ROSENFELD'S CHALLENGE TO THE FBI'S FAILURE TO COMPLY
        WITH THE SETTLEMENT AGREEMENT .........................................................4

        A.      COINTELPRO RECORDS .......................................................................5

                1.      Court's Order ................................................................................5

                2.      Records Produced .........................................................................5

        B.      SUBJECTS WHO WERE ALIVE AT THE TIME OF THE STIPULATION
                AND FOR WHOM THE FBI HAD REFUSED TO RELEASE ANY
                RECORDS ..................................................................................................6

                1.      Court's Order ................................................................................6

                2.      Records Produced .........................................................................6

        C.      SUBJECTS FOR WHICH THE FBI DID NOT RELEASE SUPPORTING
                OFFICE OR OFFICE OF ORIGIN FILES.................................................7

                1.      Court's Order ................................................................................7

                2.      Records Produced .........................................................................7

        D.      RECORDS REFERRED TO OTHER GOVERNMENTAL AGENCIES FOR
                PROCESSING .............................................................................................7

                1.      Court's Order ................................................................................7

                2.      Records Produced .........................................................................8

        E.      RECORDS ON LOCATE.............................................................................8

                1.      Court's Order ................................................................................8

                2.      Records Produced .........................................................................8

        F.      ABSTRACT CARDS ..................................................................................9

III.    ARGUMENT.......................................................................................................12

A.     ROSENFELD IS ENTITLED TO AN AWARD OF ATTORNEYS' FEES...............12

    1.     Rosenfeld Is *Eligible* for Attorneys' Fees and Costs Because
        He Has Substantially Prevailed..........................................................12

B.     ROSENFELD IS *ENTITLED* TO ATTORNEYS' FEES BECAUSE
    THIS LITIGATION RESULTED IN BENEFIT TO THE PUBLIC,
    HIS INTEREST WAS THAT OF A JOURNALIST AND SCHOLAR,
    AND THE FBI LACKED REASONABLE BASES FOR WITHHOLDING
    RECORDS ...................................................................................................13

    1.     Public Benefit...................................................................................14

    2.     Commercial Benefit and Nature of Complainant's Interest in
        the Records.......................................................................................14

    3.     Reasonableness of the Agency's Withholding ..................................15

C.     THE FEES ROSENFELD SEEKS ARE REASONABLE.........................................16

    1.     The Number of Hours Expended on This Matter Are Reasonable..................16

    2.     The Hourly Rates of Rosenfeld's Counsel Are Reasonable ...........................17

    3.     The Total Fee, in Summary, Is Reasonable ...................................18

D.     ROSENFELD IS ALSO ENTITLED TO FEES ON FEES ........................................19

CONCLUSION...........................................................................................................19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Barjon v. Dalton*,
    132 F.3d 496 (9th Cir. 1997) ............................................................. 17

*Blue v. Bureau of Prisons*,
    570 F.2d 529 (5th Cir. 1978) ............................................................. 14

*Brown v. Sullivan*,
    916 F.2d 492 (9th Cir. 1990) ............................................................. 19

*Cazalas v. Department of Justice*,
    709 F.2d 1051 (D.C. Cir. 1983) ......................................................... 15

*Church of Scientology of Cal. v. U.S. Postal Serv.*,
    700 F.2d 486 (9th Cir. 1983) ..................................................... *passim*

*Cotton v. Heyman*,
    63 F.3d 1115 (D.C. Cir. 1995) .......................................................... 14

*Davy v. CIA*,
    550 F.3d 1155 (D.C. Cir. 2008) ............................................ 14, 15, 16

*Exner v. FBI*,
    443 F. Supp. 1349 (S.D. Cal. 1978) .................................................. 13

*Hensley v. Eckhart*,
    461 U.S. 424 (1983) ..................................................................... 12, 16

*Jarno v. DHS*,
    365 F. Supp. 2d 733 (E.D. Va. 2005) ............................................... 14

*Judicial Watch, Inc. v. Bureau of Land Management*,
    610 F.3d 747 (D.C. Cir. 2010) .................................................... 12, 13

*Long v. IRS*,
    932 F.2d 1309 (9th Cir. 1991) ..................................................... 14, 16

*Miller v. Department of State*,
    779 F.2d 1378 (8th Cir. 1985) .......................................................... 15

*National Association of Concerned Veterans v. Sec'y of Defense*,
    675 F.2d 1319 (D.C. Cir. 1982) .................................................. 16, 17

*Oregon Natural Desert Association v. Locke*,
    572 F.3d 610 (9th Cir. 2009) ............................................................ 13

iii

*Piper v. Department of Justice*,
    339 F. Supp. 2d 13 (D.D.C. 2004).............................................................................14, 15

*Rosenfeld v. U.S. Department of Justice*,
    57 F.3d 803 (9th Cir. 1995) .............................................................................................3

*Rosenfeld v. U.S. Department of Justice*,
    761 F. Supp. 1440 (N.D. Cal. 1991).................................................................................3

*Tax Analysts v. Department of Justice*,
    965 F.2d 1092 (D.C. Cir. 1992).....................................................................................14

**FEDERAL STATUTES, RULES**

5 U.S.C. §552(a)(4)(E)...................................................................................................12, 13

41 C.F.R. § 101-11.410-2, 45 Fed. Reg. 5711 (Jan. 24, 1980).......................................11

Pub. L. No. 110-175, 121 Stat. 2524 ...............................................................................12

S. Rep. No. 93-854 at 19 (1974) ................................................................................14, 15

PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS
Case Nos. 90-3576 EMC; 85-1709 EMC;  85-2247 EMC
#79750 v3 saf

# NOTICE OF MOTION

PLEASE TAKE NOTICE that on July 13, 2012 at 1:30 PM in Courtroom 5, 17th Floor, United States Federal Building, 450 Golden Gate Ave, San Francisco, before the Honorable Edward M. Chen, United States District Judge, plaintiff Seth Rosenfeld will move this Court for an order awarding attorneys' fees and costs. The motion is based on this notice, the following memorandum of points and authorities, the declarations of Seth Rosenfeld, James Wheaton, David Greene, and Richard Pearl filed herewith, all matters of record filed with the Court, and other evidence that may be submitted.

PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS
Case Nos. 90-3576 EMC; 85-1709 EMC; 85-2247 EMC
#79750 v3 saf

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Seth Rosenfeld hereby seeks attorneys' fees and costs under the Freedom of Information Act ("FOIA") and the Settlement Agreement entered into by the parties in 1996. Fees are proper in this case because the proceedings Rosenfeld brought before Magistrate Judge Laporte, pursuant to the Settlement Agreement, resulted in the release of thousands of pages of records pertaining to FBI activities concerning important historical events from which the public will benefit by their disclosure. The fees sought by Rosenfeld are reasonable and appropriate and accurately reflect the time his attorneys spent obtaining the successful results.

This fee motion is separate and independent from the fee motion filed by Rosenfeld with this Court in Case No. 3:07-CV-03240 EMC, which is also calendared for hearing on July 13, 2012. That case was filed in 2007 after the FBI insisted that Rosenfeld's challenges to the FBI's processing of his request for records pertaining to Ronald Reagan be the subject of separate litigation. The attorneys' fees sought by this motion are not duplicative of the fees sought through that fee motion.

## II.   STATEMENT OF FACTS

Rosenfeld is an award-wining reporter who was for over 25 years on the staff of the *San Francisco Examiner* and *San Francisco Chronicle*. Rosenfeld has won numerous national, state and local journalism awards, particularly for his articles about the FBI's activities in regard to the University of California that were based on FBI records obtained under the Freedom of Information Act. Over the course of his career Rosenfeld has researched the FBI's operations with respect to the University of California, especially its flagship Berkeley campus, and in particular the FBI's activities as they relate to academic freedom, civil liberties and national security. Rosenfeld has focused on nationally prominent events in and around the campus community, including but not limited to the loyalty oath of the 1950s, the civil rights movement of the early 1960s, the Free Speech Movement of 1964, the anti-war movement of the latter 1960s, the development of ethnic studies, and other social and political movements. Rosenfeld has also examined the FBI's activities with respect to prominent people involved in these events, including for example the late renowned educator and University of California President Clark Kerr, the late United States President and

1

1    Governor of California Ronald Reagan, and the late Free Speech Movement leader Mario Savio.

2    [Third Declaration of Seth Rosenfeld in Support of Plaintiff's Motion for Attorneys' Fees and Costs

3    ("3d Rosenfeld Decl."), filed herewith, ¶¶ 2, 5, 15]

4        Rosenfeld has published numerous articles based on his research of the FBI's records

5    concerning the above subjects in the *Daily Californian*, the *San Francisco Chronicle*, the *Los*

6    *Angeles Times* and other publications. These include Rosenfeld's June 2002 series, "The Campus

7    Files," in the *San Francisco Chronicle*. "The Campus Files" series detailed the FBI's

8    unconstitutional and unlawful activities at the University of California, including the FBI's efforts to

9    have Clark Kerr fired as president of the university because FBI officials disagreed with Mr. Kerr's

10   personal political views and his campus policies. [3d Rosenfeld Decl. ¶¶ 2, 3 & Exh. B; Docket #92

11   Exh. A]

12       The significance of Rosenfeld's writing and research about the FBI activities with respect to

13   the University of California have been recognized in the national press. The Associated Press carried

14   reports based on "The Campus Files" series, which appeared in the *Washington Post*, the *Los*

15   *Angeles Times*, and numerous other newspapers. CNN and ABC aired news stories about "The

16   Campus Files" series, as did many other local television and radio stations. More than a dozen

17   newspapers wrote editorials about the series. *The New York Times* said in a June 16, 2002 editorial

18   about Rosenfeld's series, "These accounts of the F.B.I.'s malfeasance are a powerful reminder of

19   how easily intelligence organizations deployed to protect freedom can become its worst enemy." [3d

20   Rosenfeld Decl. Exh. B]

21       The articles also caught the attention of Senator Dianne Feinstein who made a formal inquiry

22   regarding Rosenfeld's findings to FBI director Robert Mueller. Additionally, Senator Patrick Leahy

23   cited "The Campus Files" at a hearing, calling the FBI campaign against Kerr "outrageous and some

24   would even say criminal conduct." [3d Rosenfeld Decl. Exh. B]

25       Rosenfeld is currently working on several writing projects expanding on this same topic. A

26   primary motivation for the FOIA requests at issue in this lawsuit was a book Rosenfeld has written

27   that is scheduled to be published this August entitled *Subversives: The FBI's War on Student*

28   *Radicals, and Reagan's Rise to Power*. [3d Rosenfeld Decl.¶¶ 3, 69 & Exhs. K, L]

Rosenfeld's research has been based largely on FBI records released to him pursuant to requests and complaints filed under the FOIA, including the instant action.

In a series of FOIA requests, beginning in 1981, Rosenfeld sought from the FBI "any and all" records in the agency's files pertaining to the University of California. The FOIA requests generated three lawsuits. Through consolidated actions C-85-2247-MHP and C-85-1709-MHP (Rosenfeld I), Rosenfeld sought release of records relating to nine different individuals and entities, including UC Chancellor and President Clark Kerr and the Free Speech Movement. Later, Rosenfeld brought a third action, Case No. C-90-3576-MHP, seeking additional documents pertaining to the FBI's delay in processing his original requests. The details of Rosenfeld's requests and the litigation that arose from them are set forth in Rosenfeld v. U.S. Department of Justice, 761 F. Supp. 1440, 1441-43 (N.D. Cal. 1991), and Rosenfeld v. U.S. Department of Justice, 57 F.3d 803, 806-07 (9th Cir. 1995).

On May 22, 1996, this Court, at the request of both parties, ordered that the parties' Settlement Agreement signed and dated January 11 and 12, 1996, be entered as an Order of the Court. The Settlement Agreement provided that Rosenfeld had prevailed in the above captioned cases and set forth a process under which defendants would release records to the Rosenfeld pursuant to the Freedom of Information Act. The order also designated the subjects and kinds of records to be processed [Docket #82] The parties had previously stipulated to a list of subjects covered by Rosenfeld's FOIA requests. [Docket #72]

Under the settlement agreement, the FBI agreed to "reprocess and release the documents at issue" within twelve (12) months of settlement. [Docket #82 ¶ 5] The first group of these records to be released were those covered in the Rosenfeld I case, and they were to be reprocessed and released "in two months or less" after the date of this agreement. That is, the Rosenfeld I records were to have been released no later than March 12, 1996. The remainder of these records were those covered under the Rosenfeld II case, and they were to be reprocessed and released within 12 month of the date of this agreement, that is, no later than January 12, 1997. [Docket #82]

The Settlement Agreement further provided that "all challenges to the FBI's processing of documents, claims of exemptions, and all issues relating to disclosure of records under this agreement" would be subject to adjudication by a Magistrate Judge. [Docket #82 ¶ 6] In approving

3

the Settlement Agreement, this Court further ordered that it would retain jurisdiction over these cases to "enforce and administer the terms of the agreement." [Docket #82 at 2] At Rosenfeld's request, this matter was formally referred to a Magistrate Judge by Clerk's Notice dated August 17, 2006. The Court subsequently appointed Magistrate Judge Elizabeth D. Laporte to hear the matter.

The FBI released much of what it claimed were the responsive records as required under the Settlement Agreement within the one year period. However, the FBI failed to release tens of thousands of pages for several years after the settlement date, and did not assert that it had completed processing records under the Settlement Agreement until February 28, 2006.[1] [3d Rosenfeld Decl. ¶ 17 & Exh. C]

## III.   ROSENFELD'S CHALLENGE TO THE FBI'S FAILURE TO COMPLY WITH THE SETTLEMENT AGREEMENT

Following a period of meeting and conferring between the parties that failed to resolve the issues, Rosenfeld brought a challenge before Magistrate Judge Laporte in which he identified several areas in which the FBI had not complied with the Settlement Agreement.[2] The specific areas of noncompliance and the Court's ruling on each, were as follows:

---

[1] The FBI's delay in releasing responsive records has been the subject of considerable attention both within and outside of the federal government. Following the publication of the *Campus Files*, Senator Diane Feinstein, expressing "deep concern" about the report's findings, asked FBI Director Robert Mueller whether the FBI had sought improperly to withhold information to avoid embarrassing disclosures. [3d Rosenfeld Decl. Exh. B] In late 2002, Mueller told Senator Feinstein he would open two internal investigations into the handling of Rosenfeld's FOIA requests. [Docket #92 Exh. H] Rosenfeld filed FOIA requests for the records of those investigations. Ironically, the FBI to date has declined to disclose information about its inquiries. [Docket #92 ¶ 10] In addition, a late 2003 study by the National Security Archive, a non-partisan historical research organization based at George Washington University, found that Rosenfeld's request was the oldest still-pending FOIA request in the United States. [Docket #92 Exh. I]

[2] In the interests of efficiency, Rosenfeld initially attempted to have his challenges to the noncompliance with his request for records pertaining to Ronald Reagan adjudicated in this proceeding as well. However, when the FBI objected, Rosenfeld withdrew those challenges and filed a separate lawsuit instead. Rosenfeld also challenged the FBI's failure to perform a declassification review. However, in its opposition to the challenge the FBI for the first time indicated that it had performed the review and Rosenfeld in turn withdrew the challenge.

## A.     COINTELPRO RECORDS

Rosenfeld's FOIA request specifically requested "all COINTELPRO, and other counter-intelligence-type operation documents and materials" concerning specified subjects. These requests were incorporated, along with the others, into the Settlement Agreement. COINTELPRO is an acronym for a series of now-defunct FBI counterintelligence programs. According to findings by the Church Committee, COINTELPRO was an extralegal covert operation in which the FBI went beyond law enforcement and sought to interfere with the First Amendment activities of Americans because it disagreed with their opinions. [3d Rosenfeld Decl. ¶ 46]

Although the FBI had released 34 records from the COINTELPRO files, there was no evidence that it had actually searched the COINTELPRO files. Rather it seemed that the FBI had merely relied on records in the COINTELPRO files being indexed to the pertinent subjects. However, Rosenfeld presented evidence that the FBI as a matter of practice did not index the records in the COINTELPRO files, a highly secret and unauthorized program. The FBI thus had failed to search for and identify records covered by the Settlement Agreement.

### 1.     Court's Order

The Court ordered the FBI to either "(a) perform a thorough search of all of its COINTELPRO files for all subjects and individuals as referenced in the Settlement, the Stipulation, the original requests at issue as incorporated therein, and the rulings of the Court and the Ninth Circuit in these cases or (b) provide documentary evidence such as past search slips proving it has in fact already performed such a search." [Docket #108 at 6]

### 2.     Records Produced

In response the FBI produced **more than 5,000 pages** of records. The COINTELPRO records released cover more than 56 individuals and organizations. [3d Rosenfeld Decl. ¶¶ 45, 48] As is detailed in Rosenfeld's declaration, the released records contain extremely valuable and theretofore undisclosed information about the FBI's monitoring of numerous well-known political activists.

/ / /

**B.     SUBJECTS WHO WERE ALIVE AT THE TIME OF THE STIPULATION AND FOR WHOM THE FBI HAD REFUSED TO RELEASE ANY RECORDS**

The Settlement Agreement included a stipulated list of subjects the records pertaining to which the FBI agreed to search for and produce. Among these subjects were several living people who were prominent in public affairs, or were otherwise among the types of persons whose names were specifically required to be disclosed pursuant to the Settlement Agreement. Rosenfeld challenged the FBI's practice of refusing to release records concerning these subjects absent notarized privacy waivers from them.

**1.     Court's Order**

The Court granted the challenge and ordered the FBI to search for any and all records relating to each of the 13 specified individuals and release the records pursuant to the Settlement Agreement. The FBI was permitted to withhold highly personal information on privacy grounds only to the extent the FBI complied with the balancing of interests set forth by the Ninth Circuit in *Rosenfeld*, 57 F.3d at 813. The Court further ordered the FBI to release any records or portions of records that contain the names of law enforcement officers or employees, commercial or financial institutions' employees, and all non-FBI government employees in records dated 1990 or earlier, as set forth in the Settlement Agreement, and to "either (a) certify that it has not withheld such information in any record on the basis of privacy objections, or (b) if it has withheld such information, to release those records or portions of records withheld, pursuant to the Settlement." The Court further ordered the FBI to produce records for two individuals for whom Rosenfeld had provided evidence of their deaths to the FBI. [Docket #108 at 2-4]

**2.     Records Produced**

In response, the FBI released from the FBI headquarters and the specified field offices **10,018 pages** of responsive records. The bulk of these records pertained to William Divale, a UCLA student who was involved in the campus protests while working as a paid informant for the FBI. [3d Rosenfeld Decl. ¶ 33] The records released included the FBI's administrative file on Divale containing appraisals of his work as an informant, records of payments of FBI funds to him and other internal memoranda in which FBI officials discuss Divale's activities. [3d Rosenfeld Decl.

¶¶ 40, 41] Voluminous records were also released regarding UC professors Harry Edwards, Franz Schurmann and Joseph Tussman. [3d Rosenfeld Decl. ¶ 33]

### C.   SUBJECTS FOR WHICH THE FBI DID NOT RELEASE SUPPORTING OFFICE OR OFFICE OF ORIGIN FILES

Rosenfeld also challenged the FBI's practice of failing to search the files of its field offices and offices of origin for nine specified individuals as required by the Settlement Agreement. The FBI contended that pursuant to FBI regulations, Rosenfeld was required to submit a FOIA request to each field office individually, despite the fact that pursuant to the Settlement Agreement, Rosenfeld was specifically barred from making new FOIA requests for any of these subjects.

#### 1.   Court's Order

This Court granted this challenge in part ordering the FBI to search for and release any and all records concerning the nine named individuals at up to five field offices to be specified by Rosenfeld. [Docket #108 at 2]

#### 2.   Records Produced

In response, the FBI released **441 pages** of records including 364 pages regarding Mario Savio, perhaps the most prominent of the student protest leaders. [3d Rosenfeld Decl. ¶ 32]

### D.   RECORDS REFERRED TO OTHER GOVERNMENTAL AGENCIES FOR PROCESSING

Rosenfeld also challenged the FBI's diligence in producing records the processing of which it referred to other governmental agencies. Rosenfeld specifically alleged that the FBI did not act in a timely manner in making the referrals (indeed, some of them were not made until shortly before, and immediately after, the challenges were filed), did not inform the agencies to which it referred the records of the existence of the Settlement Agreement, the established law of the case, or even the fact of the litigation, and failed to monitor the progress of the referrals.

#### 1.   Court's Order

This Court granted Rosenfeld's challenge in part. For referrals made prior to 2006, this Court permitted Rosenfeld to submit to the FBI the names of not more than five specific federal agencies that he reasonably believed had been sent referrals but for which he could not determine the status.

1  This Court then ordered the FBI to report the status of each referral to Rosenfeld. For those referrals

2  made in 2006, the FBI was ordered to communicate with the identified agencies to determine the

3  status of the referrals to Rosenfeld. For all referrals, the FBI was further ordered to communicate to

4  the other agencies that the referrals were not to be treated as new FOIA requests and that the

5  referrals were subject to the provisions of the Settlement Agreement and the prior court rulings.

6  [Docket #108 at 4-5]

7  ## 2.    Records Produced

8  In response to Judge Laporte's order concerning records referred to other agencies, the FBI

9  determined that more than 6,000 pages of records it had referred to the U.S. Army had not yet been

10  released. [3d Rosenfeld Decl. ¶ 42] These Army records were contained within FBI files concerning

11  the bureau's investigation into Soviet espionage efforts to obtain nuclear secrets from the radiation

12  labs run by UC during and after World War II. This investigation was code-named CINRAD, an

13  acronym for Communist Infiltration of the Radiation Laboratories. The FBI's CINRAD records are

14  particularly valuable to understanding bureau operations in regard to both national security and civil

15  liberties at the university. UC played a key role in developing atomic weapons during and after

16  World War II, and was thus a crucial part of our national defense, which perforce required certain

17  security measures. [3d Rosenfeld Decl. ¶¶ 43-44]

18  ## E.    RECORDS ON LOCATE

19  Rosenfeld challenged the FBI's practice of placing records "on locate" after they had been

20  identified as responsive but were not found. Rosenfeld requested that the Court order the FBI to

21  advise him of the ultimate disposition of these records.

22  ## 1.    Court's Order

23  This Court granted the challenge in part ordering the FBI to determine the location, if

24  possible, of up to ten records or files identified by Rosenfeld, and process and release those records

25  pursuant to the Settlement Agreement. [Docket #108 at 7]

26  ## 2.    Records Produced

27  In response to Judge Laporte's order that the FBI search for records that had been previously

28  unavailable and placed on 'locate,' the FBI produced an additional **1,064 pages**. [3d Rosenfeld Decl.

¶ 53] These records include 371 pages from files captioned "University of California"; 137 pages on William Frederick Cody, the late founder of Cody's books and an activist concerned with public policy on the Berkeley campus and in the city of Berkeley; and 244 pages of records on Roger Heyns, who was the chancellor of the Berkeley campus during the years 1965-1971. [3d Rosenfeld Decl. ¶ 54]

F.   ABSTRACT CARDS

Rosenfeld also challenged the FBI's refusal to search its abstract cards for records responsive to each of the subjects specified in the Settlement Agreement and stipulation. Abstract cards, one of which was created for each document placed in an FBI file, were used by the FBI between 1921 and 1979. The abstract card included the document's file number and serial and a one- to two-sentence summary of the document's content and an indication of where it was filed. [Docket #116-2 ¶ 6] The abstract cards are useful for several reasons, and may be especially valuable when the records they summarize no longer exist. Furthermore, they may provide the only available information about secret FBI records filing procedures, such as the Do Not File and No Record systems, intended to keep sensitive records out of the Central Records System and hidden from oversight. [Docket #117-3 ¶ 10]

The FBI refused to search the abstract cards claiming that the records were simply not searched in response to FOIA requests and that, indeed, it would be impossible to search them. Counsel stated at the hearing on the challenges that the abstract cards were kept in a government storage facility and "are not organized in any sort of equal way. They are strewed out in several different storage areas in different states." [Docket #116-3 at 3:4-7] In response to this Court's inquiry "Are they indexed? Are they kept for example in chronological order?" counsel replied: "No. It is sort of a jumble of happenstance by document number, by file geography, location, there are a whole number of ways so that you couldn't — if you were in a particular facility you wouldn't know where it would be without a manual search. " [Id. at 4:1-7] This description prompted Magistrate Laporte to reference the final scene from *Raiders of the Lost Ark* depicting a lowly government clerk rolling the crate containing the Ark of the Covenant to permanent untraceable obscurity amongst stacks of unlabeled boxes in the federal archives. [Declaration of James Wheaton in Support of Plaintiff's Motion for Attorneys' Fees and Costs ("Wheaton Decl."), filed herewith, ¶ 11]

9

1    Based on that description — this Court characterized the abstracts as being "not kept in any

2    logical order" — this Court concluded the abstracts need only be searched if they were organized in

3    some way that would make retrieval of the pertinent abstract cards possible without the FBI having

4    to go through the entire system of records. This Court denied the challenge without prejudice but

5    ordered the FBI to make available a person knowledgeable about the abstracts for a telephonic meet

6    and confer to determine whether it was possible for Rosenfeld to make a reasonable request to search

7    them or a subset of them. Should the parties agree that a search was possible, Rosenfeld would be

8    permitted to make a reasonable and limited search request; the Court ordered the FBI, in that event,

9    to make a reasonable search and release any records resulting from the search. [Docket #108 at 5-6]

10    Pursuant to the Court's order, the FBI produced Debra Ann O'Clair for the telephonic meet

11   and confer. Ms. O'Clair explained that, far from the "jumble of happenstance" described by counsel,

12   the abstracts were stored in a governmental records center, in which the abstracts were placed

13   sequentially in boxes according to file and serial number. She further explained that for most,

14   although not all, of the boxes the case file and serial number range of the abstracts within each box

15   was written on the outside of the box. [Docket #116-2 ¶ 9]

16    With this new information that an abstract card corresponding to a specific file number might

17   be more easily found, Rosenfeld, in written correspondence, requested that the FBI search for and

18   produce the abstracts corresponding to the file numbers the FBI had already identified as being

19   responsive to Rosenfeld's FOIA requests. The FBI declined to perform the searches questioning

20   whether it had any duty under the Settlement Agreement to search for and produce responsive

21   abstracts. [Docket #114 ¶¶ 8, 9 & Exh. A-F]

22    Faced with this impasse, Rosenfeld thus filed a Renewed Challenge with Magistrate Judge

23   Laporte seeking an order that the FBI search for and produce the abstracts corresponding to the file

24   numbers that had already been identified as being responsive to Rosenfeld's FOIA requests. The FBI

25   opposed. [Docket #116] In support of its opposition, Ms. O'Clair submitted a declaration in which she

26   explained only that the abstracts were "within the NARA facility" and made up about 2,000 of the

27   "thousands of other boxes stored there." But the FBI provided no further detail on how one might go

28   about identifying or retrieving a box that was known to contain a responsive abstract. [Docket #116-1]

10

1    Rosenfeld's reply memorandum in support of his renewed challenge thus brought to this

2  Court's attention the regulations governing the storage and retrieval of records from the NARA (the

3  National Archives Records Administration) facility, the Washington National Records Center

4  (WNRC), at issue. WNRC staff use the box number supplied by the controlling agency to locate any

5  box stored at the facility. It is the responsibility of the agency storing records at the WNRC to

6  maintain information sufficient for the WNRC staff to locate a particular box. Under the regulations

7  in place in 1983, when the boxes containing the abstracts were apparently transferred to the WNRC,

8  the WNRC would assign an accession number to every shipment of boxes it received for storage

9  indicating the precise location where the boxes would be stored. An agency seeking to transfer

10  records to the WNRC for storage was required to submit Standard Form 135, Records Transmittal

11  and Receipt. Once the transfer of records was approved, the WNRC staff would "annotate block 6j

12  of the Standard Form 135 with the Federal records center shelf location where each accession will be

13  stored." 41 C.F.R. § 101-11.410-2, 45 Fed. Reg. 5711 (Jan. 24, 1980). Once the records are received

14  at the WNRC and the cartons of records are matched against the Standard Form 135, a copy of the

15  Standard Form 135 is returned to the agency for its files. Id.  [Docket #117]

16    Rosenfeld thus claimed that there was indeed an "effective way" of searching for the desired

17  abstracts.

18    After a hearing on this renewed challenge, Magistrate Judge Laporte ordered the parties to

19  meet and confer in the courtroom to see if some agreement could be reached regarding a subset of

20  specific file numbers for which the corresponding abstracts would be searched and retrieved.

21  [Docket #120 at 9:9-19] On October 23, 2007, this Court, pursuant to the agreement of the parties,

22  entered an order whereby Rosenfeld would submit a list of up to 30 file numbers regarding any of

23  the ten specified subjects. The FBI would then conduct a search for the abstract cards at the WNRC

24  filed under those file numbers until it had identified no more than 20 main files. The FBI would then

25  process and release the non-exempt portions of all abstract cards it located. [Docket #126 at 3-4]

26    As a result of this Order, the FBI released **8,564 abstracts cards**. The abstracts released

27  serve to summarize the FBI's files concerning the university, its former president Clark Kerr, James

28  Rector, who was shot and killed during the People's Park protest; the American Federation of

11

1    Teachers; SDS at Berkeley; the Student Mobilization Committee, an anti-war group; the Vietnam

2    Day Committee; and Mario Savio. [3d Rosenfeld Decl. ¶ 59]

3    **III.   ARGUMENT**

4           The Settlement Agreement specifically contemplated that Rosenfeld might seek attorneys'

5    fees and costs for work done "in all subsequent phases of the litigation before [the] Magistrate

6    Judge." [Docket #82 ¶ 7(b)-(e)]

7           FOIA itself provides, in pertinent part, that "[t]he court may assess against the United States

8    reasonable attorney fees and other litigation costs reasonably incurred in any case under this section

9    in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E). The Ninth Circuit

10   has adopted a two-step approach to determine whether a plaintiff is entitled to an award of fees and

11   costs under 5 U.S.C. § 552(a)(4)(E). First, the complainant must demonstrate that he is *eligible* for

12   fees by showing that he has substantially prevailed. Church of Scientology of Cal. v. U.S. Postal

13   Serv., 700 F.2d 486, 489 (9th Cir. 1983). If the complainant has made this showing, the Court may

14   then exercise its discretion to determine that the complainant is *entitled* to attorneys' fees. Id. at 492.

15   Once the court determines that the plaintiff is entitled to fees, it then exercises its discretion, guided

16   by the lodestar approach, to fix the amount of fees to be awarded. Hensley v. Eckhart, 461 U.S. 424,

17   433 (1983).

18          **A.      ROSENFELD IS ENTITLED TO AN AWARD OF ATTORNEYS' FEES**

19
20          **1.      Rosenfeld Is *Eligible* For Attorneys' Fees And Costs Because He Has
                       Substantially Prevailed**

21          A FOIA plaintiff is eligible for attorneys' fees if he has "substantially prevailed" in his

22   litigation. For records produced before the FOIA fee provision was amended on December 31, 2007,

23   a FOIA plaintiff is eligible for fees if he was "awarded some relief by [a] court, either in a judgment

24   on the merits or in a court-ordered consent decree." Judicial Watch, Inc. v. Bureau of Land Mgmt.,

25   610 F.3d 747, 749 (D.C. Cir. 2010).[3] For records produced after December 31, 2007, fees may be

26   
27   ───────────────

28          [3] On December 31, 2007, the OPEN Government Act of 2007 restoring the "catalyst theory"
     of attorneys' fees became effective. See Pub. L. No. 110-175, 121 Stat. 2524 (amending 5 U.S.C. §

PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS
Case Nos. 90-3576 EMC; 85-1709 EMC;  85-2247 EMC
#79750 v3 saf

awarded even in the absence of a court order; it is enough that there was "a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii) (as amended effective December 31, 2007). Under this latter standard, the plaintiff meets this burden by presenting evidence that: (1) the filing of the action could reasonably have been regarded as *necessary* to obtain the information, that is, that the plaintiff had a compelling need to bring the litigation; and (2) the filing of the action had a *substantial causative* effect on the delivery of the information, that is, that the suit resulted in the production of the documents. <u>Church of Scientology</u>, 700 F.2d at 489 (emphasis in original) (interpreting the catalyst theory of fee recovery reinstated by the 2007 FOIA amendments).

Applying either standard, Rosenfeld is eligible for attorneys' fees. In this case, as discussed above, over 14,000 pages of records were produced as a direct result of the Court's orders.

## B. ROSENFELD IS *ENTITLED* TO ATTORNEYS' FEES BECAUSE THIS LITIGATION RESULTED IN BENEFIT TO THE PUBLIC, HIS INTEREST WAS THAT OF A JOURNALIST AND SCHOLAR, AND THE FBI LACKED REASONABLE BASES FOR WITHHOLDING RECORDS

Once the plaintiff has demonstrated that he is eligible for an award of attorneys' fees, the court, exercising its discretion, considers whether he should actually receive them. <u>Church of Scientology</u>, 700 F.2d at 492. In so doing, the following criteria are relevant: (1) the benefit to the public, if any, deriving from the case; (2) the commercial benefit to the complainant; (3) the nature of the complainant's interest in the records sought; and (4) whether the government's withholding of the records sought had a reasonable basis in law, and (5) "'whatever factors it deems relevant in determining whether an award of attorney's fees is appropriate.'" <u>Id.</u> (quoting <u>Exner v. FBI</u>, 443 F. Supp. 1349, 1352 (S.D. Cal. 1978)).

---

552(a)(4)(E)). These amendments made fee awards available not only when litigation results in "a judicial order, or an enforcement written agreement or consent decree," but also when the litigation results in a "voluntary or unilateral change in position by the agency." <u>Id.</u> The Ninth Circuit has held that subsection (4)(E)(ii) does not operate retroactively with respect to an attorney fee award entered before the effective date of the statutory amendment. <u>Oregon Natural Desert Ass'n v. Locke</u>, 572 F.3d 610, 617 (9th Cir. 2009). However, the catalyst standard will apply to all "voluntary" productions of records that occurred after December 31, 2007. <u>See</u> <u>Judicial Watch</u>, 610 F.3d at 750 (denying applicability of amendment because the records were produced before the effective date).

1    Here, each factor weighs in Rosenfeld's favor.

2         **1.**    **Public benefit**

3    The public benefit factor supports an award of attorneys' fees and costs where "the

4 complainant's victory is likely to add to the fund of information that citizens may use in making vital

5 political choices." Cotton v. Heyman, 63 F.3d 1115, 1120 (D.C. Cir. 1995) A journalist's practice of

6 obtaining information for the express purpose of disseminating it to the public is the quintessential

7 example of when this factor is met. See Church of Scientology, 700 F.2d at 492 n.6 ("'Under the

8 first criterion a court would award attorney's fees, for example, where a newsman was seeking

9 information to be used in a publication[.]'") (quoting S. Rep. No. 93-854 at 19 (1974)). And the

10 more widespread the dissemination, the stronger the public benefit. Blue v. Bureau of Prisons, 570

11 F.2d 529, 533 (5th Cir. 1978). The fact that the FOIA requester is planning to write a book using the

12 information obtained through the litigation thus weighs in favor of entitlement to attorneys' fees. See

13 Piper v. Dep't of Justice, 339 F. Supp. 2d 13, 22 (D.D.C. 2004). A public benefit also exists in FOIA

14 requests for information that seek to hold government agencies accountable for their actions. See,

15 e.g., Jarno v. DHS, 365 F. Supp. 2d 733, 738 (E.D. Va. 2005) (finding public interest in release of

16 records regarding agency's handling of a high-profile asylum case); Piper, 339 F. Supp. 2d at 21

17 (finding public benefit where information concerned allegations of FBI evidence tampering).

18    There can be no dispute that the public benefits from the release and dissemination of the

19 records obtained through the challenges. As detailed in Rosenfeld's declaration, the challenges

20 resulted in the release of numerous historically important records of the FBI's often unlawful

21 activities at the time. [3d Rosenfeld Decl. ¶¶ 29-31, 36-41, 44, 49-52, 55, 64, 65-71]

22         **2.**    **Commercial benefit and nature of complainant's interest in the records**

23    The second and third criteria, the commercial benefit and the plaintiff's interest, are often

24 considered together. Tax Analysts v. Dep't of Justice, 965 F.2d 1092, 1095 (D.C. Cir. 1992). As

25 with the first factor, these factors weigh in favor of entitlement if the FOIA requester intends to

26 publish the information received in a book or article. Davy v. CIA, 550 F.3d 1155, 1160 (D.C. Cir.

27 2008) (explaining that "news interests" should not be considered commercial interests); Long v. IRS,

28 932 F.2d 1309, 1316 (9th Cir. 1991) (holding that a court "[sh]ould generally award fees if the

14

complainant's interest in the information sought was scholarly or journalistic or public-oriented.")
(quoting <u>Church of Scientology</u>, 700 F.2d at 492 n.6 (in turn quoting S. Rep. No. 93-854 at 19)). The
fact that the FOIA requester may get paid for writing his book does not in and of itself weigh against
entitlement to attorneys' fees. <u>Davy</u>, 550 F.3d at 1160 (reversing the district court's contrary
conclusion because "surely every journalist or scholar may hope to earn a living plying his or her
trade, but that alone cannot be sufficient to preclude an award of attorney's fees under FOIA.");
<u>Piper</u>, 339 F. Supp. 2d at 21-22 (noting that where both private and public interests exist, "[t]he fact
that plaintiff will benefit commercially from potential sales of this book is not sufficient to tip the
scale in favor of characterizing plaintiff solely as a commercial requester"). "[A] journalist who
gathers information of potential interest to a segment of the public, uses [his] editorial skills to turn
the raw materials into a distinct work, and distributes that work to an audience" is to be "favorably
treated under FOIA's fee provision." <u>Davy</u>, 550 F.3d at 1161-62 (internal quotation marks omitted).

These factors weigh strongly in favor of entitlement. As set forth above, Rosenfeld
specifically requested the records in his role as a journalist who has spent decades researching and
reporting on the FBI's activities in California. Moreover, these requests were made with the express
purpose of providing material for his soon-to-be-published book

### 3. Reasonableness of the agency's withholding

Even if there were an overriding private self-interest or pecuniary motivation for obtaining
the records — as shown above, there was not one here — FOIA requester may nevertheless be
entitled to attorneys' fees if the agency lacked a reasonable basis in law for withholding the records
or has been "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate
behavior." <u>Cazalas v. Dep't of Justice</u>, 709 F.2d 1051, 1054 (D.C. Cir. 1983) (quoting S. Rep. No.
93-854 at 19 (1974)). <u>See also</u> <u>Miller v. Dep't of State</u>, 779 F.2d 1378, 1390 (8th Cir. 1985) ("When
a private citizen is obliged to seek legal services in order to wrest from the government information
which the government had no legal reason to withhold from him, he is entitled under the Act to be
reimbursed for the cost to which he has been put.").But this factor is only required where the
information obtained is not in the public interest; a journalist FOIA requester should ordinarily be
entitled to fees "even where the government's defense had a reasonable basis in law." S. Rep. 93-

15

854 at 171-72 (1974). The agency bears the burden of demonstrating the reasonableness of its positions. <u>Davy</u>, 550 F.3d at 1162-63.

As set forth above, the FBI ignored the express provisions of the Settlement Agreement and withheld thousands of pages of clearly responsive records. And moreover, the FBI was less than candid with this Court and Rosenfeld in describing its ability retrieve specific boxes of abstract cards from the WNRC. (Indeed, the FBI was less than candid in even identifying the WNRC as the facility in which the boxes were stored.) As it soon became clear, the storage of the abstracts was far from the "jumble of happenstance" first described by the FBI. Indeed, the abstracts were maintained by professional archivists and subject to the storage and retrieval protocol set forth in the WNRC's regulations — information that was all supplied to the Court by Rosenfeld through his own research, not the FBI.

Rosenfeld is thus entitled to attorneys' fees.

## C.    THE FEES ROSENFELD SEEKS ARE REASONABLE

Once a plaintiff has proven both eligibility for and entitlement to fees, the award must be given, and the Court has discretion only to determine the reasonableness of the amount sought. <u>Long</u>, 932 F.2d at 1314. Calculation of fees is based on a lodestar figure, which is the number of attorney hours reasonably spent on the matter multiplied by the lawyers' reasonably hourly rates. <u>Hensley v. Eckhart</u>, 461 U.S. 424, 433 (1983). An applicant for attorneys' fees is entitled to an award for "time reasonably expended." <u>Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.</u>, 675 F.2d 1319, 1327 (D.C. Cir. 1982). If the Court finds that both the hours expended and the corresponding hourly rates are reasonable, there is a "strong presumption" that the lodestar represents a reasonable award. <u>Long</u>, 932 F.2d at 1314.

### 1.    The number of hours expended on this matter are reasonable

The number of hours expended by Rosenfeld's lawyers from the nonprofit organization First Amendment Project was reasonable, especially considering the volume of records at issue, the variety of issues raised, and the number of court proceedings required to resolve all disputed issues. The specific work performed over the five years this case was pending is detailed in the Declarations of James Wheaton ("Wheaton Decl.") and David Greene ("3d Greene Decl."), filed herewith, and

16

1  the detailed time records attached thereto. As the declarations make clear, these hours reflect only

2  productive time or time expended on issues for which Rosenfeld ultimately prevailed. See

3  Concerned Veterans, 675 F.2d at 1327. The evidence demonstrates that counsel on behalf of

4  Rosenfeld's counsel worked efficiently and spent a reasonable amount of time on these tasks.

5  **2.      The hourly rates of Rosenfeld's counsel are reasonable**

6  The proper hourly rate is the rate "prevailing in the community for similar work performed

7  by attorneys of comparable skill, experience, and reputation." Barjon v. Dalton, 132 F.3d 496, 502

8  (9th Cir. 1997) (examining hourly rate under § 1988). Evidence of the proper hourly rate can take

9  the form of affidavits reciting precise fees that attorneys with similar qualifications have received in

10 similar cases, the rate the attorney had been awarded in prior litigation, and the rate the attorney

11 charges to paying clients in her legal practice. Concerned Veterans, 675 F.2d at 1325-27.

12 As the evidence here makes clear, the hourly rates requested are reasonable and well within

13 the prevailing hourly rates in the San Francisco Bay Area (the relevant legal market) for lawyers of

14 comparable skill, experience, and reputation who handle matters of the type involved in this case.

15 Rosenfeld's counsel, First Amendment Project (FAP) is a non-profit organization providing

16 direct legal representation on public interest free speech and free press matters. The hourly rates

17 applied in this fee motion are the actual rates set forth in FAP's representation agreement with Mr.

18 Rosenfeld. FAP sets its rate for its lawyers and interns based on the prevailing market rates for

19 attorneys of similar experience and expertise using data obtained from fees awarded in other pro

20 bono and contingency matters. [Wheaton Decl. ¶¶ 39-40; Declaration of Richard Pearl, filed

21 herewith] FAP's fee rates have been approved of as reasonable by numerous courts in California,

22 both federal and state. [Wheaton Decl. ¶ 35]

23 David Greene was Executive Director and Staff Counsel of FAP during the period from the

24 commencement of this action through July 2011. Since August 2011, he has been counsel at Holme,

25 Roberts & Owen LLP and its successor, Bryan Cave LLP. He is an experienced litigator with over

26 20 years of experience devoted mostly to First Amendment law. His hourly rate since 2011 has been

27 $550 per hour. His 2009 rate of $500 per hour has been approved by California courts and was

28 recently affirmed by the California Court of Appeal. [3d Greene Decl. ¶¶ 10, 11] James Wheaton is

the co-founder and Senior Counsel at FAP. He is an experienced litigator with 28 years of experience in public interest law, including First Amendment law for the last 21 years at the First Amendment Project. His standard hourly rate of $700 has been approved of as reasonable by other state and federal courts in California. [Wheaton Decl. ¶¶ 27-35] The remaining FAP staff attorneys all were first- or second-year lawyers and thus had billing rates of $200 per hour. First Amendment Project also found it efficient to use lower billing, that is, $100 per hour, student interns and summer associate from some tasks including document management and legal research and writing. [Wheaton Decl. ¶¶ 37-38]

### 3.    The total fee, in summary, is reasonable

The total fee requested is **$156,088.49**. The fee was calculated as follows:

| Phase I: Fee Summary from  March 1, 2006 through October 23, 2007 | | | |
|---|---|---|---|
| **Professional** | **Hours** | **Rates** | **Total** |
| James Wheaton | 88.05 | $500.00 | $44,025.00 |
| David Greene | 94.96 | Various | $41,547.74 |
| Pondra Perkins | 26.85 | $200.00 | $5,370.00 |
| Student Legal Interns | 4.00 | $100.00 | $400.00 |
| **Subtotal** | 213.86 | | $91,342.74 |
| Phase II: Fee Summary from October 24, 2007 through October 27, 2010 | | | |
| **Professional** | **Hours** | **Rates** | **Total** |
| James Wheaton | 50.20 | $600.00 | $30,120.00 |
| David Greene | 7.70 | Various | $3,694.75 |
| Student Legal Interns | 29.00 | $100.00 | $2,900.00 |
| **Subtotal** | 86.90 | | $36,714.75 |
| **Total Fees, Phases I and II** | | | $128,057.49 |

/ / /

/ / /

PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS
Case Nos. 90-3576 EMC; 85-1709 EMC;  85-2247 EMC
#79750 v3 saf

1

2    **D.    ROSENFELD IS ALSO ENTITLED TO FEES ON FEES**

3        Rosenfeld is also entitled to recover fees for the attorney time expended in preparing this fee

4    motion. Brown v. Sullivan, 916 F.2d 492, 497 (9th Cir. 1990). Although additional time will be

5    expended in preparing reply papers and preparing for and appearing at the hearing, the amount

6    incurred through June 7, 2012 is as follows:

7

| Phase III: Fees Summary from March 14, 2012 through June 7, 2012 | | | |
|---|---|---|---|
| **Professional** | **Hours** | **Rates** | **Total** |
| James Wheaton | 18.95 | $700.00 | $13,265.00 |
| David Greene | 21.00 | $550.00 | $11,550.00 |
| Lowell Chow | 16.08 | $200.00 | $3,216.00 |
| **Subtotal** | 56.03 | | **$28,031.00** |
| **Grand Total Fees, All Phases** | **356.79** | | **$156,088.49** |

15        In addition, First Amendment Project has incurred costs on behalf of Mr. Rosenfeld of

16    $2,075.83. [Wheaton Decl. ¶ 20]

17                              **CONCLUSION**

18        For the foregoing reasons, Rosenfeld's motion for an award of attorneys' fees and costs in

19    the amount of **$158,164.32**, plus the fees that will be incurred from June 8, 2012 forward, should be

20    granted.

21

22    Dated:  June 8, 2012                    BRYAN CAVE LLP

23

24                              By:  /s/ David A. Greene
                                  David A. Greene
25                                Attorneys for Plaintiff Seth Rosenfeld

26

27

28